**Rebecca C. RATANA, Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**No. 80–1861.**

United States Court of Appeals, Fourth Circuit.

Argued June 3, 1981.

Decided Oct. 1, 1981.

---

Richard N. Bush, Tax Division, Dept. of Justice, Washington, D. C. (John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Richard Farber, Tax Division, Dept. of Justice, Washington, D. C., on brief), for appellant.

Julie Noel Gilbert, Washington, D. C. (Cohen & Uretz, Washington, D. C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, PHILLIPS and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

This is an appeal by the Commissioner of Internal Revenue from a Tax Court ruling that Rebecca C. Ratana, the taxpayer, was not liable for taxes due on joint returns she and her husband filed.

The sole issue is whether the taxpayer is an "innocent spouse," as defined in section 6013(e) of the Internal Revenue Code of 1954, and therefore not jointly liable for taxes on the unreported income earned in

1974 and 1975 by her husband. The taxpayer's husband, a citizen of Thailand and a United States resident, was involved in a lucrative narcotics trade in 1974 and 1975. The Commissioner determined a deficiency in income tax of $91,582.30 and $415,043.63 against the taxpayer and her husband for those years. The taxpayer was unaware of her husband's narcotics activities and neither the Tax Court nor the Commissioner dispute the fact that the taxpayer did not receive any of his illegally earned income, with the possible exceptions of $30,000 used to purchase certificates of deposit for her children and small amounts spent for household and related expenses in amounts in excess of their jointly reported income. The Tax Court was correct in ruling the taxpayer was not liable for taxes on income of which she was not aware, but it was in error in holding her not liable for income tax on the $30,000 and any other amounts she actually received. The Tax Court decision is affirmed in part, reversed in part and remanded so that the court may determine the amount received by the taxpayer.

The taxpayer was born in 1934 in the Philippines. Her father was a Seventh Day Adventist minister, and she received her education and initial nurses' training at Seventh Day Adventist institutions. She came to the United States in 1959 to continue her training and has been employed since that time as a registered nurse at the Washington Adventist Hospital.

In 1961 the taxpayer married Suwan Ratana, a citizen of Thailand. The taxpayer testified that she was aware when she married Ratana that in the Thai culture a wife submits to her husband and does not question his decisions. The taxpayer also was aware that, in marrying Ratana, she would have to accept such a relationship. The Seventh Day Adventist Church teaches that divorce is not an acceptable solution to marital difficulties.

Suwan Ratana, prior to his involvement in the narcotics trade, never was able to make a substantial financial contribution to the family. As a result, except for brief periods following the birth of each child,

the taxpayer worked without leave or vacation from 1959 until approximately 1975. She also consistently sought overtime assignments.

Throughout her employment at Washington Adventist Hospital, the taxpayer had a portion of her wages deposited directly into a credit union account. These savings provided the entire downpayment for the family's home and for two small rental properties. The total fair market value of the family home and the rental properties is approximately $180,000. The taxpayer testified that the income from the rental properties was saved to enable her children to attend religious secondary schools and college.

From 1964 through April, 1975, Suwan Ratana was employed by the Royal Thai Embassy, initially as a clerk and later as a bookkeeper. Sometime prior to 1974, the taxpayer learned that her husband was a compulsive gambler. At her urging, Ratana joined Gamblers Anonymous and the taxpayer joined Gam-Anon, a support organization for spouses of gamblers. In Gam-Anon, spouses are encouraged to assume financial responsibility for the family but are taught not to question the gambling spouse regarding his activities or finances. Specifically, the spouses are encouraged to accept, without question, any money offered by the gambler.

During 1974 Suwan Ratana began to travel a great deal and during 1975 he spent most of his time in Thailand. He told the taxpayer variously that he had set up an export business, that he worked for an airline in Thailand, that he was setting up a travel business, and that he was selling property he owned in Thailand. In reality, however, Suwan Ratana was involved in the illegal importation and sale of narcotics. Ratana's departures on his travels frequently were sudden and unannounced. At one point in 1975 the taxpayer heard nothing from him for more than three weeks.

In 1975 and 1976, Ratana gave the taxpayer a total of $30,000 in two installments, which she used to purchase certificates of deposit in the names of their children. Ra-

tana told the taxpayer the funds came from the sale of property in Thailand. From time to time he also apparently gave her various small amounts of money, which she used for household expenses.

During 1974 the taxpayer made estimated expenditures of $29,626.88 and in 1975 of $25,128.27 for food, clothing, housing and other family needs. The taxpayer had available to her, from sources other than Ratana's unreported narcotics income, $22,-270.65 in 1974 and $13,569.23 in 1975. These funds consisted primarily of taxpayer's salary, Ratana's embassy salary and rental income.

Ratana's salary during 1974, his last full year of employment at the embassy, was $7,305.00. In every federal income tax return which he prepared during the period of his embassy employment, Ratana omitted the amount of his embassy salary from gross income. The taxpayer questioned Ratana regarding this omission, and he explained that his embassy salary was paid by Thailand and was therefore not subject to taxation by the United States. The Ratanas' 1970 and 1973 tax returns were audited by the Internal Revenue Service, and in each audit the omission of the embassy salary from gross income was accepted by the IRS. In reality, however, Ratana's salary was not exempt. Although a tax treaty between Thailand and the United States had been negotiated at this time, it was not yet in effect. The taxpayer testified that she believed that any income from sources outside the United States was excluded from federal taxation.

In October, 1976, Suwan Ratana entered a plea of guilty to two counts of tax evasion and was sentenced to two consecutive four-year prison terms. When released on bond, he fled the United States to Thailand. In June 1980, the taxpayer received a letter from Ratana, informing her that he would not be returning to this country.

The Internal Revenue Service determined that the Ratanas understated their joint taxable income by $169,894.06 in 1974 and $632,134.00 in 1975. As a result, the Commissioner determined the Ratanas were lia-

ble for deficiencies in income tax of $91,-582.30 and $415,034.63. Most of the understatement was due to failure to report Mr. Ratana's narcotics income. The Commissioner also determined that the understatement of income was fraudulent and that both the taxpayer and Ratana were jointly liable for additions to tax for fraud. The Tax Court, however, held that the taxpayer was not liable for the fraud penalties. The Commissioner did not appeal that ruling and it is not in issue. In the Tax Court the taxpayer did not contest the amount of taxable income omitted from the Ratana's joint returns. She maintained that she qualified as an innocent spouse under section 6013(e) of the Code and was therefore not liable for any tax deficiency. The Tax Court ruled that the taxpayer was an innocent spouse as defined in section 6013(e), which provides:

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) In General.—Under regulations prescribed by the Secretary, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission.

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such

# 224

liability is attributable to such omission from gross income.

The Commissioner does not contest either the correctness of the Tax Court's fact-finding or the Tax Court's determination that the taxpayer met the requirements of section 6013(e)(1)(A) and (C), but argues that the taxpayer was aware of unreported income and therefore did not meet the requirement of section 6013(e)(1)(B).

◼ As the Tax Court stated in its opinion, the taxpayer has the burden of proving that she satisfied each of the requirements set forth in section 6013(e)(1). *Adams v. Commissioner,* 60 T.C. 300, 303 (1973); *see also Sanders v. United States,* 509 F.2d 162 (5th Cir. 1975); *Vesco v. Commissioner,* 39 T.C.M. (CCH) 144 (1979); *Anderson v. Commissioner,* 34 T.C.M. (CCH) 508 (1975); *Joss v. Commissioner,* 56 T.C. 378 (1971).

◼ The requirement of subsection (B) is not satisfied merely by a showing that a taxpayer was unaware that certain earnings should be included in gross income. The spouse must establish that he or she "did not know and had no reason to know ..." that the gross income was omitted from the joint returns. The question of whether a taxpayer with no actual knowledge "had ... reason to know" is largely determined by the facts of each case. *Venser v. Commissioner,* T.C. Memo 1978–256; *Hackney v. Commissioner,* T.C. Memo 1976–099.

◼ Although none of the parties to this controversy disagree as to these general rules or as to what actually happened in the lives of the taxpayer, her children, and husband, the Commissioner disputes the application of the controlling rules to the facts developed in the Tax Court. The Tax Court held the taxpayer to have had no actual knowledge of her husband's unreported income, reasoning that receipt of $30,000 for the children's education account did not alert her to the far greater sums he had received in the narcotics trade. The Tax Court's finding of this matter is not clearly erroneous. Some, of course, accept it as correct. The $30,000 the taxpayer directly received from Ratana presents a different problem. The Tax Court reasoned that the taxpayer was such a captive of her marital circumstances that she could have received $30,000 from her husband without speculating as to its source. In an ingenious argument, taxpayer's counsel admits that ignorance of the tax consequence of receiving the $30,000 is not sufficient to relieve the taxpayer of liability, but contends that "gross income" is such a labyrinthian concept that ignorance of its effects avoids the requirements of section 6013(e)(1). The taxpayer believed that the $30,000 came from the sale of property in Thailand and that such foreign income was not included in "gross income." Her counsel contends that while relief from joint liability cannot be predicated on ignorance regarding the taxability of known amounts of gross income, it can be predicated on ignorance regarding whether certain income is viewed as "gross income" for taxation purposes.

Acceptance of either the Tax Court's or the taxpayer's argument would undermine the legislative purpose behind imposing joint liability for joint returns, and would be contrary to the intent of section 6013(e)(1). *McCoy v. Commissioner,* 57 T.C. 732 (1972); *see* S.Rep.No. 91–1537, 91st Cong., 2d Sess. (1971–1 Cum.Bull. 606), *reprinted in* [1970] U.S.Code Cong. & Ad. News 6089.

A taxpayer who both receives funds from a spouse and files a joint tax return with that spouse, can hardly deny knowing that such funds were omitted from inclusion in the joint return. Since we hold the taxpayer had actual knowledge of the $30,000 sufficient to preclude her reliance on section 6013(e)(1)(B), it is not necessary to discuss whether she had "reason to know." The taxpayer, in addition to the $30,000 used to purchase the certificates of deposit, received other sums in excess of their combined reported income. The taxpayer and

her husband reported income of approximately $22,270 and $13,569 for 1974 and 1975, while they spent approximately $29,626 and $25,128 during those two years. Here, too, she had actual knowledge of the excess she and her husband spent over the amount reported on the joint return.

■ The omission of her husband's Thailand Embassy income is another matter. She certainly had actual knowledge of its omission, but the omission was encouraged and its propriety confirmed by the IRS. We cannot, under such circumstances, characterize such omission as having been made with the actual knowledge or "reason to know" which, under section 6013(e)(1), precludes the status of "innocent spouse."

We hold, therefore, that the "innocent spouse" provision of section 6013(e)(1) is not available to the taxpayer as it relates to the two sums received from her husband totaling $30,000, nor as it relates to the sums she and her husband spent for family expenses in 1973 and 1974 which were in excess of the income reported for those years. She is, however, an "innocent spouse" with regard to her husband's embassy salary and with regard to all other sums received by her husband in 1973 and 1974, and is not liable for income tax on those sums.

The decision of the Tax Court is therefore reversed in part, affirmed in part, and remanded for action consistent with the views expressed in this opinion.

*REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.*