JASON R. WALKER and MARION L. WALKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Walker v. Commissioner
Docket No. 2353-83.
United States Tax Court
T.C. Memo 1985-278; 1985 Tax Ct. Memo LEXIS 354; 50 T.C.M. (CCH) 105; T.C.M. (RIA) 85278; June 11, 1985. Thad F. Niemira and Ralph A. Dobberstein, for the petitioners. James A. Kutten, for the respondent. GOFFE MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax for the taxable years 1974, 1975, 1976, and 1977 in the amounts of $12,199.20, $9,729.74, $17,965.87, and $24,786.71, respectively. The Commissioner also determined that additions to tax under section 6653(b) *355 [1] should be imposed on Marion L. Walker for the taxable years 1974, 1975, 1976, and 1977 in the amounts of $6,099.60, $4,864.87, $8,982.94, and $12,393.36, respectively.After concessions, the issue for decision is whether Jason R. Walker is an innocent spouse under section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. Jason R. Walker (Jake) and Marion L. Walker (Marion) resided in St. Louis, Missouri, at the time the petition in this case was filed. Petitioners filed joint Federal income tax returns for the taxable years in issue on the following dates: Taxable Year
Date Filed
1974
April 15, 1975
1975
June 16, 1976
1976
June 15, 1977
1977
June 19, 1978
Marion signed the tax returns for the taxable years 1974, 1975, and 1976 with Jake's approval and authority, but without his review. Jake signed the tax return *356 for the taxable year 1977 in blank, but again Marion was authorized to file the return on behalf of both petitioners. Jake and Marion intended that these joint returns be their sole returns for these taxable years. Jake and Marion were married in April 1954. At the time of trial, Jake was 61 and Marion was 60. During the taxable years in issue, petitioners maintained only one checking account, at the Gravois Bank in St. Louis. Marion handled virtually all of the finances for the family, including the banking, the payment of bills, and all of the shopping. Jake relied on her totally for all money metters during the taxable years in issue, because he loved her and because she had a better education. Jake asked his wife for no more than a half dozen blank checks during the taxable years in issue, all of which he wrote to his union. Jake finished high school in 1939 in Bourbon, Missouri. He worked as a freight operator for one year before serving in the military as a radio communication lineman stringing telephone wires, answering telephones, and working on a switchboard. Jake left the military in 1946, and has had no formal education since that time. Jake has been *357 employed as a grocery store clerk for the Kroger Company for the past 38 years. He has no other job. Jake is paid weekly by the Kroger Company by voucher rather than paycheck. Each employee is issued a voucher by his store on payday. The employee signs the voucher, and redeems it for cash at his store. Jake brings the cash home, and gives it to his wife. During the taxable years in issue, Jake generally had no more than $20 to $30 in pocket money. Marion was employed from October 1967, to March 1978, as a secretary and bookkeeper for National Vinegar Company. She trained herself in accounting and bookkeeping through the library. Before her job at National Vinegar Company, Marion worked as a waitress and with the telephone company. During the years in issue, Marion misappropriated large amounts of funds from National Vinegar Company by issuing company checks payable to herself while listing actual customers as payees on the company's books and records. When National Vinegar Company received its bank statements, Marion destroyed the cancelled checks for the misappropriated funds. Marion was the sole endorser of the misappropriated checks except for four checks *358 co-endorsed by Jake. All of the misappropriated checks, in the total of $138,365.05, were deposited in petitioners' checking account. Generally, Marion received her paychecks from National Vinegar Company every two weeks. Eight of the paychecks were altered by Marion. For the taxable years 1976 and 1977, all but five of the unaltered paychecks were cashed. The remaining five paychecks were deposited into the checking account. During the taxable year 1977, Marion misappropriated an additional $8,000 from National Vinegar Company by placing the numeral "1" to the immediate left of her net pay on eight of her paychecks, thereby increasing each paycheck amount by $1,000. Marion endorsed each altered paycheck, depositing six in the checking account, and cashing the two remaining paychecks. For the taxable years 1974 through 1977, inclusive, the following table reflects: (1) Jake's gross wages from the Kroger Company, (2) Marion's gross legitimate wages from the National Vinegar Company, (3) total legitimate wages of the Walker family, (4) the annual amounts Marion embezzled, and (5) the total family income. Jake's
Marion's
Total
Total
Gross
Legitimate
Legitimate
Marion's
Annual
Year
Wages
Gross Wages
Wages
Embezzlement
Income
1974
$11,062.26
$10,050.00
$21,112.26
$30,089.05
$51,201.31
1975
11,802.00
10,600.00
22,402.00
24,480.17
46,882.17
1976
13,752.45
12,000.00
25,752.45
38,957,50
64,709.95
1977
14,514.05
12,900.00
27,414.05
52,838.33
80,252.38
*359 During the taxable years in issue, Marion took care of the family finances, including petitioners' checking account. All payments described below were made by check, unless otherwise specified. Petitioners' residences, all of which were in the St. Louis area, from 1967 through June 1978, were: (a) From 1967 through May 1970, petitioners rented a flat at 3500A Nebraska, St. Louis, for $65 per month, not including the cost of utilities. (b) From May 1970, through February 1972, petitioners lived in a one-bedroom apartment at 8151 Briarhaven Terrace, St. Louis, renting for $159 per month, not including the cost of utilities. (c) From February 1972, through January 1976, petitioners lived in a two-bedroom apartment at 8159 Briarhaven Terrace, St. Louis, tenting for $219 per month, not including the cost of utilities, increasing yearly to $289 per month, not including the cost of utilities. (d) In January 1976, petitioners purchased a house at 1330 Green Mist Drive, Fenton, for $32,750, obtaining a loan for $26,200. Petitioners' monthly mortgage payments, including principal, interest, taxes, and insurance, were $287.61 in 1976 and $289.28 in 1977. (e) In June 1978, *360 petitioners moved to an apartment at 407 Meramec Woods, Arnold, renting for $175 per month, not including the cost of utilities. The furniture used in the Nebraska Avenue flat was purchased by Marion before petitioners married in 1954. During the period from June 1, 1974, through August 20, 1977, petitioners purchased furniture from Hub Furniture Company, Pool Mart, and Wicks Furniture Company as follows: Amount of
Date of Purchase
Purchase
June 1, 1974
$626.88
October 9, 1976
967.31
October 28, 1976
296.05
January 28, 1976
773.27
November 20, 1976
208.99
August 19, 1977
407.92
August 20, 1977
52.25
After petitioners bought their house, they purchased the following items: Date of
Amount of
Purchase
Item Bought
Purchase
December 1975 and
January 1976
Custom drapes
$932.60
March 1976
Fence around house
545.00
September 1976
Kitchen range
795.92
October 1976 and
December 1976
Materials and work in basement
1,368.00
May 1977
Materials, basement and bathroom
1,000.00
June 1977
Materials and work, miscellaneous
263.98
July 1977
Materials, cedar sun deck and
2,353,50
patio, security lights
Between *361 1954 and 1966, petitioners were a one-car family. In 1966, petitioners purchased a second car, a 1952 Ford. Between 1966 and 1974, petitioners generally owned two cars: a newer model car and an older car. During the taxable years in issue, petitioners owned two new cars at all times. Payments on all loans were made through the checking account. (a) On September 10, 1974, petitioners purchased a new 1974 Chevrolet Blazer for $4,932. Petitioners received a $2,932 trade-in allowance on their 1973 Capri, and financed the $2,000 balance. (b) On June 18, u975, petitioners purchased a new 1975 Chrysler Cordoba for $6,146. Petitioners received a $3,000 trade-in allowance on their 1974 Buick Century, made a $1,146 downpayment, and financed the $2,000 balance. (c) In August 1976, petitioners purchased a new 1976 Ford Ranchero for $5,865. Petitioners received a $3,600 trade-in allowance for their 1974 Chevrolet Blazer, made a $50 downpayment, and financed the $2,215 balance. (d) During the period from August 13, 1976, through September 8, 1976, Marion rented a 1976 Monte Carlo, and paid $421.68 by check. (e) On September 8, 1976, petitioners purchased a new 1977 Chrysler *362 Cordoba for $7,515.30. Petitioners received a $2,609.62 trade-in allowance for their 1975 Chrysler Cordoba, made a $200 downpayment, and financed the $4,705.68 balance. When petitioners purchased their new cars, they were both present, and they were together when they gave their financial information for credit approval. The wages listed on the credit applications and the actual wages are listed below: Jake
Marion
Date
Listed
Actual
Listed
Actual
June 18, 1975
$940.00/mo.
$983.50/mo.
$1,350.00/mo.
$883.33/mo.
August 1976
271.00/wk.
264.47/wk.
400.00/wk.
230.77/wk.
September 1976
1,100.00/mo.
1,146.04/mo.
1,250.00/mo.
1,000.00/mo.
Petitioners' yearly payments on their charge accounts with Central Hardware Company, Mastercharge, Mobil Oil, and Visa for the taxable years 1974 through 1977 were: Charge Account
1974
1975
1976
1977
Central Hardware Company
$1,236.87
$974.89
Mastercharge
$3,187.73
$3,284.52
3,529.66
3,664.49
Mobil Oil
675.07
1,216.89
1,196.80
990.09
Visa
1,783.84
1,362.06
1,643.20
1,306.66
During the years 1970 through 1977, petitioners took the following vacations:
*363 (a) In September 1970, petitioners drove to Florida and stayed for free at a land development. (b) In 1971, petitioners took a 9-day trip to the Bahamas. (c) In 1972, petitioners took a trip to Yellowstone National Park and Omaha, Nebraska. (d) Petitioners did not take a vacation in 1973. (e) In 1974, petitioners took a 14-day trip to Hawaii that cost approximately $1,800. (f) In 1975, petitioners took a trip to Fresno, California, and Las Vegas, Nevada, for 14 days; travel costs were approximately $1,200, including airfare and car rental. (g) Petitioners did not take a vacation in 1976. (h) In April 1977, petitioners took themselves, Marion's son and daughter-in-law on a 14-day trip to Hawaii; travel costs were $3,846.16, including airfare and hotel. Petitioners paid $508 by Eastern Airlines credit card and $3,338.16 by check. During the taxable years in issue, Marion was a frequent customer at Hopper Furs in St. Louis. Hopper Furs sells quality furs and women's fashions. Marion usually shopped at Hopper approximately five times a year and spent approximately $200 on each visit. Marion always purchased items of high quality. Marion paid for her purchases *364 with cash, charge, check, and sometimes cashed her paycheck from National Vinegar. Marion also purchased new clothes for Jake from Wolff's, an exclusive men's store. Jake had not owned clothes of such quality before. Marion gave Joan Walker Ashlock (Joan), her daughter, approximately $1,000 per month during this period, and specifically $10,928 during the taxable year 1977. Jake was aware that Marion gave Joan money, put her through beauty school, and helped her open a beauty parlor, but did not know the amount of the gifts, and thought that part of the funds for the beauty parlor were from credit union loans. In the 1960's Jake was concerned about the family finances, as petitioners had children at home until 1968. In the 1970's "everything seemed to be going smooth" and he was no longer concerned. Jake sometimes inquired if they could afford an expenditure such as a vacation, and Marion would tell Jake not to worry. Petitioners both received regular raises during the taxable years in issue. During the taxable years 1974, 1975, 1976, and 1977, Jake knew the family had money other than straight wages coming in, but did not know that the other money was not being *365 reported on the tax returns. Marion explained to her husband that she received work-related bonuses and that the she had won bets on the horses. She would find the winners of the previous day's races in the newspaper, and say that she had winning tickets on those horses. Petitioners did not report any bonuses or horse betting earnings on their joint income tax returns. After discovering the embezzlement, National Vinegar Company fired Marion on March 14, 1978. Soon after she was fired, petitioners hired an attorney to represent them in restitution negotiations with National Vinegar Company. Jake knew by the end of March 1978, at the latest, that his wife had embezzled money. On June 19, 1978, Marion and Jake executed a deed transferring title to their house in Fenton, Missouri, and title to a lake lot, to National Vinegar Company as partial restitution. Marion is not presently employed. Petitioners have no income other than Jake's wages, and no remaining property of substance. On November 30, 1982, the Commissioner issued a statutory notice of deficiency to petitioners for the taxable years 1974, 1975, 1976, and 1977. The Commissioner determined that the embezzled *366 amounts had not been included on petitioners' tax returns. The Commissioner also determined that petitioners had not substantiated a portion of their charitable contributions for the taxable years 1975 and 1976, that petitioners were not entitled to exemptions for Marion's daughter and grandson for the taxable year 1976, and that various other adjustments were necessary as a consequence of the increase in adjusted gross income for the taxable years 1975, 1976, and 1977. The Commissioner also imposed section 6653(b) additions to tax on Marion for civil fraud. OPINION The Commissioner's determination in his statutory notice of deficiency is presumptively correct, and petitioners have the burden of disproving each individual adjustment. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). After concessions, the issue for decision is whether Jason R. Walker is an innocent spouse under section 6013(e), [2] which provides that in certain circumstances a spouse who has filed a joint Federal income tax return will be relieved from liability to the extent that such liability results from a substantial understatement of tax attributable to grossly erroneous *367 items of one spouse.
In order for Jake to qualify for the relief provided by the statute, the following conditions must be satisfied for each of the taxable years in issue: (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.-- (1) IN GENERAL.--Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the *368 deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. The first requirement of section 6013(e)(1)(A) is that a joint return must be made for the taxable year in issue.Jake said that he may not have signed petitioners' 1974, 1975, or 1976 tax returns, and that his wife may have signed his name to those returns. The intention of the parties to file a joint return is a question of fact. Estate of Campbell v. Commissioner,56 T.C. 1, 12 (1971). Jake stipulated that his wife was authorized to sign the returns, and that he adopts the returns as his tax returns. We find that petitioners filed joint tax returns for the taxable years 1974, 1975, and 1976. Similarly, Jake intended that the joint Federal income tax return filed for the taxable year 1977 be his return, despite having signed it in blank. The preliminary prerequisite for relief under section 6013(e)(1)(A) that petitioners filed joint tax returns for *369 the taxable years 1974, 1975, 1976, and 1977 is, therefore, satisfied. The second requirement is that there be a substantial understatement of tax attributable to grossly erroneous items of one spouse. "Grossly erroneous items" in section 6013(e)(1)(B) includes any item of gross income attributable to such spouse which is omitted from gross income. Sec. 6013(e)(2)(A). "Substantial understatement" in section 6013(e)(1)(B), (C), and (D) means any understatement of tax (as defined in section 6661(b)(2) (A)) which exceeds $500. Sec. 6013(e)(3). The understatement must exceed a specified percentage of the spouse's income, as provided in section 6013(e)(4), unless the liability is attributable to the omission of an item from gross income. Sec. 6013(e)(4)(E). As the understatement both exceeds $500 for each of the taxable years in issue, and is also attributable to an omission from gross income, we need not compare the understatement to Jake's adjusted gross income in the preadjustment year, defined as the most recent taxable year of the spouse ending before the date the deficiency notice is mailed. Sec. 6013(e)(4)(C). Further, the omitted income is solely attributable *370 to Marion. Petitioners have satisfied the second requirement for relief under section 6013(e)(1)(B). All four statutory requirements, however, must be satisfied and it is the remaining two requirements of sections 6013(e)(1)(C), and (D) that respondent contends that petitioners have failed to meet. Estate of Jackson v. Commissioner,72 T.C. 356, 360 (1979); Adams v. Commissioner,60 T.C. 300 (1973). Petitioners have the burden of proving that all requirements for innocent spouse tax relief are satisfied. Rule 142(a); Ratana v. Commissioner,662 F.2d 220, 224 (4th Cir. 1981); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971). However, this Court recognizes that section 6013(e) is a remedial statute, as explained by the Fifth Circuit Court of Appeals: * * * Congress intended the [innocent spouse] exception to remedy a perceived injustice, and we should not hinder that praiseworthy intent by giving the exception an unduly narrow or restrictive reading. [Sanders v. United States,509 F.2d 162, 166-167 (5th Cir. 1975); fn. ref. omitted.] Section 6013(e)(1)(C) requires petitioners *371 to establish that Jake did not know or have reason to know of the understatement of tax when he signed the return. In order to do this, he must prove (1) that he did not have actual knowledge of the understatement of tax, and (2) that the omission was not of such character as to cause a reasonably prudent person possessed of Jake's experience and temperament to have known of the omission. The above determinations are questions of fact. Sanders v. United States,509 F.2d 162, 165, 167 (5th Cir. 1975); Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 697-699 (1972). The returns for the taxable years 1974, 1975, and 1976 were signed by Marion for Jake in her continuing capacity as the financial manager of the marriage, and were not reviewed by him. Although Jake signed the return for the taxable year 1977, the return at that point was blank. We find that Jake did not have actual knowledge of the understatement of tax on the returns. Knowledge of the omission and consequent understatement of tax may be imputed to the spouse, however, if a reasonably prudent person possessed of his experience *372 and temperament would have known of the omission. This Court has found at least three factors significant in deciding whether a spouse had reason to know of omissions from gross income: (1) unusual or lavish expenditures, Mysse v. Commissioner,supra at 699; (2) participation in business affairs or bookkeeping, Quinn v. Commissioner,62 T.C. 223 (1974), affd. 524 F.2d 617 (7th Cir. 1975); and (3) the guilty spouse's refusal to be forthright concerning the couple's income, Adams v. Commissioner,supra. Although there was an increase in the general standard of living for petitioners, none of the expenditures can be properly characterized as unusual or lavish. Jake is a man of limited education who totally relied on his wife to handle the family finances. Marion has accounting and bookkeeping experience, and would be presumed by a man of Jake's experience and temperament, and was, in fact, presumed by Jake, to have properly completed the returns. Finally, Jake's inquiries on money matters were general, and answered generally, but adequately, albeit untruthfully. The requirement of section 6013(e)(1)(B) *373 that Jake neither knew or had reason to know of the omission is, therefore, also met. Sanders v. United States,supra.
Having found that Jake neither knew nor reasonably should have known of the substantial understatements of tax for the taxable years at issue, we must now determine whether, taking all of the facts into consideration, it is inequitable to hold Jake liable for the deficiency attributable to the omissions. Whether Jake significantly benefitted from the substantial understatements of income is a factor to be considered in making this determination. [3] Respondent argues that Jake received significant benefits from the embezzled and omitted income. Petitioners *374 disagree, asserting that the benefits received by Jake were no more than ordinary support, which is an insufficient basis to support a finding of significant benefit. Petitioners also contend that it would be inequitable to impose liability upon Jake on the basis of all of the facts and circumstances. "Inequitable" is defined under section 1.6013-5(b), Income Tax Regs.[4]: Whether it is inequitable to hold a person liable for the deficiency in tax, * * *, is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" for purposes of this determination. Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of income should have been included in gross income. Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds which are traceable to items omitted *375 from gross income by his spouse, that person will be considered to have benefited from those items. Other factors which may also be taken into account, if the situation warrants, include the fact that the person seeking relief has been deserted by his spouse or the fact that he has been divorced or separated from such spouse. Although petitioners' standard of living was better than it would have been without the embezzled funds, it is well settled that a significant benefit does not exist where the omitted income is used primarily for the normal support of the family. Sec. 1.6013-5(b), Income Tax Regs.; Terzian v. Commissioner,supra at 1172; Mysse v. Commissioner,supra at 698-699. Further, Jake himself received few noticeable benefits from the embezzled income, as a substantial portion of the funds was used for the benefit of Marion's relatives. We note that, after restitution to Marion's employer, petitioners have retained little, if *376 any, of the proceeds of the embezzlement, and that Jake, who is still a grocery store clerk in a Kroger grocery, is now the sole source of income for his family. Respondent's final contention is that relief from liability was intended primarily for the benefit of spouses who are deserted, divorced, or separated. As petitioners were still married as of the time of trial, as they had been for 30 years, respondent argues that it is not inequitable to impose liability upon Jake for the deficiencies. S. Rept. 91-1537 (1970), 1971-1 C.B. 606, 608. None of the language of section 6013(e) indicates that its relief is intended to be limited to spouses who are victims of broken marriages. Mysse v. Commissioner,supra at 700. The above-referenced committee report indicates that whether the spouse has been separated or divorced is only one of the factors to be considered in determining whether it is inequitable to hold the innocent spouse liable for the deficiencies. [5] Further, the recent liberalization of the innocent spouse provisions militate against a narrowing of their scope. Sanders v. United States,supra at 166-167; *377 see H. Rept. 98-432, Pt. 2 (Mar. 5, 1984) 1501, 1503. We simply do not believe that the fact that Jake has stood by his wife through sickness as well as through health should deny him the benefits of section 6013(e). We are loathe to find equity in imposing liability under the facts and circumstances set forth above, and conclude that it would be inequitable to charge Jake with the tax liabilities incurred by his wife on her unreported income. Sec. 6013(e)(1)(D). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, and attendant regulations as amended and in effect for the relevant years, and all rule references are to this Court's Rules of Practice and Procedure.↩
2. After trial and briefing herein, sec. 6013(e) was amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), with retroactive application to all taxable years to which the Internal Revenue Code of 1954 and of 1939 applies. See H. Rept. 98-432, Pt. 2 (March 5, 1984) 1501, 1503. By order of this Court, the parties were permitted to, and did, file supplemental briefs as to the effects of the amendment.↩
3. Sec. 6013(e)(1)(C), prior to its amendment, explicitly required that we consider "whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income * * *." While sec. 6013(e), as amended, no longer specifically requires that we determine whether the spouse significantly benefitted from the omitted income, that factor is still to be taken into account. See H. Rept. 98-432, Pt. 2 (March 5, 1984), supra↩ at 1502.
4. These regulations were promulgated before July 18, 1984, the effective date of the present sec. 6013(e), which no longer includes a specific reference to a significant benefits test.↩
5. See Quint v. Commissioner,T.C. Memo. 1985-226↩.