CLIFTON CLEVENGER, [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CATHERINE CLEVENGER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Clevenger v. Commissioner
Docket Nos. 5586-80, 10545-80, 23106-80, 3753-81.
United States Tax Court
T.C. Memo 1986-149; 1986 Tax Ct. Memo LEXIS 462; 51 T.C.M. (CCH) 835; T.C.M. (RIA) 86149; April 15, 1986. Harrison M. Robertson, for the petitioner in docket Nos. 5586-80, 23106-80, and 3753-81. Alan M. Schwartz, for the petitioner in docket No. *464 10545-80. Lawrence D. Garr, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' joint Federal income tax and determined additions to tax due to fraud under section 6653(b)[2] as follows: Clifton Clevenger ("Clifton") [3]
Deficiency
Addition
1973
$50,087.85
$25,043.92
1974
92,958.20
46,479.10
1975
52,454.97
26,227.48
1976
79,721.38
39,860.69
1977
154,640.64
93,800.00
1978
41,623.78
20,811.89
Catherine Clevenger ("Catherine") [4]
Deficiency
Addition
1976
$79,721.38
$39,860.69
*465 The issues for decision are: (1) whether petitioners received constructive dividends during any year in issue; (2) whether any part of any underpayment of tax required to be shown was due to fraud within the meaning of section 6653(b); (3) whether Clifton is relieved from liability for tax, interest, and addtions to tax as an innocent spouse within the meaning of section 6013(e); (4) whether assessment and collection of the deficiency and addition to tax under section 6653(b) for the year 1974 is barred by the doctrine of res judicata; (5) whether assessment and collection of the deficiencies and additions to tax under section 6653(b) for the years 1973, 1974, and 1975 are barred by the statute of limitations under section 6501(a). The stipulated findings of fact and accompanying exhibits are incorporated herein by this reference as is Catherine's post-trial stipulation of settlement. FINDINGS OF FACT Petitioners were married in the year 1952. Petitioners remained married and filed joint returns for each of the years before the Court.Clifton resided at Clarksville, Maryland, when he filed his petitions herein. Catherine resided at Highland, Maryland, when she filed her petition *466 herein. During the year 1957, petitioners and Clifton's father, Clifton Clevenger, Sr., formed the Clevenger Corporation for purposes of engaging in general construction. Clifton Clevenger, Sr., served as president and was an active participant within the organization. Clifton served as vice-president, carpenter, and foreman until 1970. Sometime during the year 1970, Clifton Clevenger, Sr., redeemed his interest in Clevenger Corporation and Clifton assumed the position of president. During each of the years in issue, Clifton served as president of Clevenger Corporation. Clifton also served as president of C & C Builders, Inc., since its formation during the year 1971. Catherine served as secretary-treasurer of Clevenger Corporation and C & C Builders, Inc., during the years at issue. During all relevant years to the determinations herein, petitioners each owned a 50 percent interest in Clevenger Corporation, C & C Builders, Inc., and Clevenger Supply Company. [5]
During the relevant *467 years concerning the determinations herein, petitioners' corporate roles were bifurcated and quite distinct. Catherine was responsible for financial matters such as invoicing accounts and posting job order costs. Her responsibilities included office supervision with particular emphasis within the accounting department where she monitored payroll, receivables, and payables. She established and administered corporate bookkeeping procedures and maintained custody of such records. Although her father was a Certified Public Accountant, she at no time received formal accounting education or related training. Catherine assumed responsibility for all corporate tax matters and also assumed responsibility for the preparation of the joint individual income tax returns filed concerning the years at issue.Catherine developed all relevant workpapers necessary to prepare such returns. Thomas Hoffmeister, C.P.A. ("Hoffmeister"), who is also Catherine's father, prepared and signed the corporate and individual tax returns. Hoffmeister relied solely upon Catherine's workpapers, and he performed no additional accounting services for Clevenger Corporation or petitioners. In sum, Catherine was the *468 comptroller and chief financial officer of the Clevenger Corporation and C & C Builders, Inc., during the years at issue. In addition to filing the personal joint income tax returns, Clifton delegated and relied upon Catherine to manage all other financial matters concerning the operation of the domestic household including all check writing responsibilities. Clifton exercised complete dominion over the actual construction operations of the Clevenger Corporation and C & C Builders, Inc. His responsibilities included the submission of estimated bids concerning projects sought by Clevenger Corporation and C & C Builders, Inc. Clifton also coordinated and directed construction personnel as to job site assignments. Clifton typically reviewed corporate mail each morning and examined those items which related to sales or bids. However, he routinely directed all other mail such as invoices, bank statements, deposits on account, or tax related matters to Catherine. As to deposits on account, Clifton examined only those items in excess of $5,000 as he was able to recognize such payments by identifying the return address on the envelope. Petitioners began to experience marital difficulties *469 during the early 1970's. By the end of 1973, petitioners structured their daily schedules so as to minimize personal contact. Catherine often worked during the night until 3:00 or 4:00 a.m. or returned to the marital home upon Clifton's arrival at Clevenger Corporation each morning. Eventually, Catherine moved from the marital home in May or June of the year 1975. Catherine managed all aspects of petitioners' personal financial matters until such time. Clifton continued to rely upon Catherine to prepare their joint individual income tax returns even after their separation in May or June of 1975. During the years 1973 through 1978, certain employees of Clevenger Corporation performed services on real properties owned by petitioners as tenants by the entireties. The employees were paid for this work by Clevenger Corporation. Clevenger Corporation and C & C Builders, Inc., purchased materials and performed services which were used for the construction, repair, or maintenance of such real properties owned by petitioners. Clevenger Corporation and C & C Builders, Inc., also purchased farm equipment and supplies for petitioners' son Clifton Clevenger III ("Clifton III"). The above *470 farm equipment and supplies were ordered by Clifton III and invoiced to Clevenger Corporation. Catherine rendered payment with corporate funds without Clifton's knowledge. Petitioners owned three parcels of real property as tenants by the entireties during the years at issue. The location of such properties were Tucker Lane, Sandy Spring, Maryland ("Tucker Lane"), Brown Bridge Road, Fulton, Maryland ("Brown Bridge"), and Route 216, Highland, Maryland ("Highland"). Tucker Lane was built in the early 1960's and was the marital home until petitioners' separation in 1975. Brown Bridge Road was built in 1974 and was occupied by Clifton III as a residence and operating farm. Highland was completed in 1977 and was occupied solely by Catherine. Several improvements were made to Tucker Lane during 1973: Tucker Lane had been built with a flat roof; however, petitioners added an entire third floor with an outside balcony and spiral staircase in anticipation of their daughter's wedding reception. Also to accommodate the reception, petitioners enclosed and carpeted a carport so as to better serve their guests. General maintenance activities were performed at Tucker Lane and typically *471 performed by John Taylor, a Clevenger Corporation employee. The improvements and services to Tucker Lane were paid by Clevenger Corporation. As was the customary procedure, Clifton set up a job folder with an assigned job number applicable to Tucker Lane which was necessary to accumulate invoices for labor and material specifically job costed to Tucker Lane. The Clevenger Corporation and C & C Builders, Inc., spent approximately $45,000 at Tucker Lane during the years in issue. Clifton also set up a job sheet for Brown Bridge "described as a Scope - one story rambler - no basement - with attached garage per plans." Clifton estimated a budget amount of $44,500 to construct Brown Bridge. The Brown Bridge improvements, however, actually exceeded Clifton's original estimate by $15,000 to $20,000. The cost overrun was due to the construction of a barn, a machine shop, fences, tool sheds, and a large pond which were not reflected in the original estimate drafted in the year 1974. Clifton was unaware of these improvements which were not included in the original estimate. As of October 1977, he was aware that the barn had been built. Catherine set up a job sheet and assigned a job *472 number applicable to the Highland property during 1975. The job sheet description designated such property as a "Scope-3 bedroom, 2-story New England style farm house with breeze way to attached garage" and indicated "person in charge - Catherine Clevenger and son-Clifton III." Clifton did not direct the construction at Highland and was unaware of the actual cost associated with the construction of such property until February 1980. Clevenger Corporation and C & C Builders, Inc., expended approximately $200,000 to build the barn, the residence, and a swimming pool at Highland. On October 20, 1977, petitioners cosigned three interest bearing notes in the respective amounts of $40,000, $22,250, and $22,250 payable to Clevenger Corporation. The latter two notes were executed in reference to the improvements at Brown Bridge which commenced in 1974. [6] The $40,000 note is determined to have been executed in reference to the improvements at Highland which commenced during 1975. No interest has been received by Clevenger Corporation on any of these notes. However, the corporate minutes of January 10, 1980, indicate that the Brown Bridge notes were cancelled and the $40,000 note reduced *473 by the amount of $14,600 as offsets to amounts owed by Clevenger Corporation due to Catherine. Catherine, as secretary-treasurer of Clevenger Corporation, was indicated for filing false and fraudulent corporate tax returns for the years 1973 through 1977 in violation of section 7206(1). In January 1980, Catherine entered a guilty plea with respect to the corporate return filed for the fiscal year ended 1977 and was sentenced to serve a prison term of two years. During the weekend immediately prior to the commencement of her prison term, Catherine withdrew over $160,000 from the Clevenger Corporation to purchase additional property known as Glenwood Farm which she and Clifton III had negotiated to purchase. Clifton was informed of the defalcation on the succeeding day by Cathy Twigg who had replaced Catherine as office manager. Clifton instituted an internal investigation and determined that a pattern of abuse over several years existed concerning the cash account and the improvements. Clifton informed the Internal Revenue Service and remained cooperative *474 during the investigation. Clifton, as president of Clevenger Corporation, was indicted under section 7206(2) concerning the corporate tax returns for the years 1973 through 1977.These charges, upon recommendation of the U.S. Attorney, were dismissed. Petitioners were also indicted under section 7201 for attempting to evade income taxes by filing fraudulent joint individual income tax returns for the years 1973 through 1977. As to Clifton, these indictments were also dismissed. As to Catherine, a motion nolle prosequi entered by the U.S. Attorney concerning indictments relating to the individual returns was accepted by the U.S. District Court for the District of Maryland. Due to the indictments, the General Services Administration ("GSA") refused to continue business relationships with Clevenger Corporation. Clifton was able to restore Clevenger Corporation to good standing with GSA and to satisfy withholding tax liabilities, interest, and additions owed by Clevenger Corporation. In August of 1975 and subsequent to petitioners' separation during 1975, Catherine's father, Hoffmeister, prepared an initial memorandum concerning the division of marital property. Under this *475 proposed settlement, Clifton was to receive full title to Tucker Lane, however, he was to pay Catherine $20,000 upon the sale of such property or the expiration of three years. Catherine was to receive the Highland property subject to unpaid mortgages and the execution of a $40,000 note payable to Clevenger Corporation. Brown Bridge was to be conveyed to Clifton III if he assumed an existing mortgage and executed two notes for $30,000 each payable to his parents. Clifton and Catherine were to each execute a note to Clevenger Corporation in the amount of $22,250. In August of 1977, a similar agreement was drafted by legal counsel. Pursuant to the agreement concerning Tucker Lane Clifton paid the amount of $20,000 to Catherine in November 1977. In February of 1979, an agreement which acknowledged mutual satisfaction concerning property division was executed by petitioners. Under such agreement Clifton acknowledged receipt of Tucker Lane and Catherine agreed to receive Highland and Brown Bridge. In February of 1980, Catherine forged Clifton's signature and recorded a deed which purported to convey Highland to her. Clifton filed a complaint to quiet title. In November of 1982, *476 after seven years of attempted property settlements, petitioners executed a final property settlement attendant to their divorce decree. Such property settlement awarded Catherine the Highland property and the rights to the proceeds from the sale of Brown Bridge, which were rolled over into the Glenwood Farm operated by Clifton III. Such agreement also provided that Catherine transfer all of her interest in the Clevenger Corporation, C & C Builders, Inc., and the Clevenger Supply Company as well as her one-third interest in an office building to Clifton. Actually, she transferred all Clevenger stock to Clevenger Corporation contrary to the documents in the record. This Court entered a stipulated decision of no deficiency in September 1977 relative to petitioners' 1974 joint income tax liability. Such decision did not involve section 6653(b) assertions or constructive dividends relative to real property improvements now at issue. OPINION The threshold issue for determination is whether petitioners received constructive dividend income from Clevenger Corporation and C & C Builders, Inc., as determined by respondent. [7] Clifton asserts that the amounts at issue are properly *477 characterized as accounts receivable to Clevenger Corporation evidenced by property settlement memoranda and agreements as well as petitioners execution of notes payable to Clevenger Corporation. We agree with respondent. Where a corporation has incurred costs to construct, maintain, or otherwise improve real property owned by a shareholder, such costs may constitute constructive dividends to be recognized by the shareholder as dividend income if the shareholder received a benefit attributable to such costs without the expectation of repayment. Magnon v. Commissioner,73 T.C. 980, 994 (1980); Estate of Clarke v. Commissioner,54 T.C. 1149, 1161 (1970); Benes v. Commissioner,42 T.C. 358, 379 (1964), affd. per curiam 355 F.2d 929 (6th Cir. 1966). [8] Whether the distributions were primarily for the benefit of the shareholders are *478 questions of fact. Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1215 (5th Cir. 1978); Gibbs v. Tomlinson,362 F.2d 394 (5th Cir. 1966). It is patently obvious that petitioners benefited from the improvements to real estate and other costs expended on their behalf. Several factors are relevant to determine whether there was an expectation of repayment for costs incurred to improve real estate--whether the shareholder in fact paid any costs during or upon completion of construction; whether the shareholder was financially able to repay the corporation; whether the project costs were treated in the same manner as other projects in the normal course of business; whether the shareholder attempted to conceal records of project costs, and whether a construction contract essentially provided that the corporation incur the costs of the project. Gibbs v. Tomlinson,supra at 397; Magnon v. Commissioner,supra at 995-996; *479 Estate of Clarke v. Commissioner,supra at 1160-1161; Benes v. Commissioner,supra at 377-378. Petitioners bear the burden of proving that respondent's determination of the underlying deficiencies are erroneous. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). We have concluded that the amounts in issue constituted constructive dividends. The improvements in issue commenced as to Tucker Lane during 1973, as to Brown Bridge during 1974, and as to Highland during 1975. Petitioners paid no part of the costs relating to these improvements when commenced, during, or upon completion of the improvements at issue. On October 20, 1977, petitioners cosigned three promissory notes in the respective amounts of $40,000, $22,250, and $22,250 payable to Clevenger Corporation, the latter two with reference to Brown Bridge. The corporate minutes of January 1980 indicate that the $40,000 note executed in October 1977 was made with reference to property, presumably Highland, enjoyed by Catherine. Although Highland was owned by petitioners *480 as tenants by the entireties during all relevant years at issue, petitioners' clear intention, as evidenced by all settlement memoranda and agreements including the initial draft of August 1975, was that Catherine was to receive the Highland property. Job folders are an integral aspect of any attempt to properly account for cost under the specific job order cost method of accounting employed by Clevenger Corporation. Although job folders were established for each of the three parcels in issue, costs were not properly posted and there is no evidence that the failure to record properly specific job order costs was a systematic failure affecting other Clevenger Corporation projects. Therefore, we conclude that petitioners have failed to negate respondent's determination that the amounts in issue constituted constructive dividends. Clifton asserts that constructive dividends for the year 1973 were not received because such dividends were offset or repaid to Clevenger Corporation during 1980 by virtue of debt offsets concerning petitioners' notes executed on October 20, 1977, in the respective amounts of $40,000, $22,250, and $22,250. We have determined that the $40,000 note was executed *481 in reference to Highland and the latter notes executed in reference to Brown Bridge. The notes were executed in October 1977 and offset in January 1980. The improvements at Highland and Brown Bridge were commenced subsequent to the year 1973. Furthermore, Clifton manifested no intention to repay Clevenger Corporation concerning the improvements during 1973.Consequently, the debt offset of January 1980 does not operate to reduce constructive dividends received during the year 1973. [9]
The next issue for decision is whether petitioners are liable for additions to tax for fraud pursuant to section 6653(b) for each of the years in issue. Fraud is not imputed from one spouse to another, and, in the case of a joint return, respondent must prove fraud on the part of each spouse. Section 6653(b)(4); Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), *482 affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner,56 T.C. 213, 227 (1971). Respondent has the burden of proving fraud by clear and convincing evidence. Rule 142(b); sec. 7454(a); Miller v. Commissioner,51 T.C. 915, 918 (1969). In order to prove fraud, respondent must show that petitioner intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. When fraud is determined for more than one taxable year, respondent must establish that some part of an underpayment was due to fraud for each taxable year for the corresponding addition to tax to be upheld. Professional Services v. Commissioner,79 T.C. 888, 930 (1982); Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). The existence of fraud is a question of fact to be resolved upon a consideration *483 of the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1381 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Stephenson v. Commissioner,79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Gajewski v. Commissioner,supra at 200; Stone v. Commissioner,supra at 223-224. Catherine has conceded that the joint individual income tax returns for the years at issue were filed with fraudulent intent. Catherine exercised complete dominion concerning the preparation of the financial information of the Clevenger Corporation and related entities as well as petitioners' joint income tax returns. Catherine prepared and delivered all relevant workpapers to Hoffmeister, who is also her father. Hoffmeister prepared and signed the corporate income tax returns and *484 the joint individual returns for all relevant years. He relied solely upon Catherine's workpapers. Although he was a corporate director of Clevenger Corporation, his primary role was limited to that of a tax preparer. Hoffmeister did discuss unreasonable compensation issues with petitioners in the early 1970's; however, in our view such discussion was not of causal significance to the underpayments as to Clifton. Clifton did not participate in the preparation of Catherine's workpapers or meet with Hoffmeister concerning tax matters. Clifton made no attempt to understand the mechanics of tax accounting or tax return preparation and had little comprehension of the financial condition of the Clevenger Corporation. Clifton narrowly and unwisely focused his attention solely on the construction aspects of the business. We have determined that the amounts in issue constituted constructive dividends. These amounts were typically deducted on the corporate tax return by Clevenger Corporation as cost of goods sold. Job order costs not specifically posted to projects were posted to a general inventory account identified as ST1000. Catherine would identify and post ST1000 costs to specific *485 projects. Catherine testified that Clifton was aware that the improvements at issue were charged to the ST1000 account and not posted to the specific projects. Alfred Jeffery ("Jeffery"), a Clevenger Corporation employee, also testified that Clifton directed Tucker Lane costs be posted to ST1000. Catherine and Jeffery also testified that Clifton assigned John Taylor, a Clevenger Corporation employee, to work assignments at Tucker Lane with knowledge that Clevenger Corporation paid his salary. We find Jeffery's testimony to be inconclusive as to whether Clifton manifested the requisite fraudulent intent. We find Catherine's testimony to be self serving to implicate Clifton in her fraud with a view to allaying her financial burdens and her obligations to respondent. We determine from the demeanor and the overwhelming facts of her own admitted and obvious dishonesty that her testimony is totally unreliable and unworthy for our determinations. Clifton III testified as to conversations of Clifton concerning unreasonable compensation and tax rates. We find this to be inconclusive to our determinations. Catherine assisted Clifton III with farm equipment and supplies purchased with *486 corporate funds. Catherine received the marital rights in Brown Bridge, which was Clifton III's farm and residence, and assisted and invested in the purchase of Glenwood Farm with Clifton III. Clifton III did not impress us as a credible witness. We find him totally biased against his father and, consequently, unreliable. Respondent asserts that Clifton with knowledge and intent to evade income tax consented to the posting of personal expenditures to the ST1000 account without intent to repay. Respondent's assertions, when viewed in the context and perspective of the entire record, miss the mark of establishing the elements of civil fraud. Petitioner's marital difficulties started during 1973. As a result, Clifton was under severe emotional stress during each year at issue. Catherine structured her schedule so as to avoid Clifton by often working hours which approximated a night shift. Although being under one roof, petitioners had minimal contact. Petitioners separated during 1975. During each year in issue, Catherine, as shareholder, corporate officer, and employee of Clevenger Corporation, continued to be an integral factor in the financial operation of the business. *487 Clifton, as respondent asserts on brief, adopted a "head in the sand" defense as does the ostrich. Clifton's decision to be uninformed as to all financial aspects of Clevenger Corporation as well as his personal financial matters may have been unwise and perhaps grossly negligent. Nevertheless, we find that Clifton did not manifest a fraudulent intent to evade income tax as to any year in issue. [10] We believe Clifton was intellectually dominated by Catherine as to financial matters, that he was insecure to the point of being cowed by her, and that the cunning and brutal cozenage was solely of her own doing. We have concluded, based upon our close observation of Clifton and Catherine during the course of the trial, that Catherine, not Clifton, is the culprit in this nefarious scheme and intrigue. We believe Catherine used all of her cunning and guile to preclude Clifton from any knowledgeable understanding of her endeavors to use corporate assets for their personal benefit without any accounting to respondent. She may have had no formal training in sophisticated accounting, but, she was capable of maintaining *488 books and records for profitable business enterprises. In our opinion, she is simply a dishonest person who would not even come clean with her own father in the preparation of their individual and corporate tax returns. Her sinister motive was to serve and enrich Clifton III and herself at the expense of Clifton and respondent. Clifton merely was a capable construction person who lacked the proclivity to divert and conceal which his wife, Catherine, had in abundance. He did not participate in the fraudulent scheme directly but only incidentally by way of whatever benefit trickled down to him from Catherine's expenditures of his work and the corporation's resources. He did not have knowledge of how Catherine charged the work he had performed at their properties. He left this to Catherine, and this delegation to her almost cost him his company and all of his assets. Clifton's record in rebuilding the company, his disclosure to the Internal Revenue Service when he became aware of the discrepancies following Catherine's departure for prison, his cooperation in the resulting examination, all show us his reliability and respectable attitude following the discovery that he had been *489 totally duped. We see no "evil intent", Spies v. Commissioner,317 U.S. 492 (1943), in Clifton, which we find so rampant in Catherine whose only purpose in these proceedings was self serving to lessen her burdens and obligations to respondent. We think Clifton did not want to know too much about the finances which he left to Catherine's responsibility and that he used this, perhaps, as a shield against whatever demands she made of him with the trials and tribulations which would seem inevitable if her demands were not met. We reiterate that we closely observed the demeanor of Clifton and Catherine during the course of the trial. We are impressed that, of the two, Clifton is the credible one. Catherine's despicable theft from the corporation just prior to her departure to the penitentiary reflects her attitude and objective better than her testimony. Clifton's endeavor to make corrections, including his contacting respondent, promptly following his discovery of Catherine's cozenage reflects best his attitude and objective. Catherine is a thief who duped her husband. Clifton is the duped husband who was manipulated and emasculated, at least financially, by *490 Catherine who was much too clever for Clifton to understand. Catherine's eclectic concealment to cozen the corporate treasury was beyond Clifton's comprehension. Simply, he lacked the imagination to conspire to Catherine's fecund fraudulent scheme. Catherine is the perpetrator of the fraud, not Clifton, who nevertheless benefitted from the fraud and who reasonably should have known that something fishy was going on. Based on the foregoing, we determine that respondent has not satisfied the burden of proof necessary to establish the asserted additions to tax under section 6653(b) as to Clifton. Sec. 7454(a); Rule 142(b). Having sustained respondent's finding of a deficiency, we must next decide whether Clifton is an innocent spouse under section 6013(e), [11] which provides that, in certain circumstances, a spouse who has filed a joint Federal income tax return will be relieved from liability to the extent that such liability results from a substantial understatement of tax attributable to grossly erroneous items of one spouse. Petitioner has the burden of proving that all requirements *491 for relief from tax as an innocent spouse are satisfied. Rule 142(a); Ratana v. Commissioner,662 F.2d 220, 224 (4th Cir. 1981); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971). In order for petitioner to qualify for the relief provided by the statute, the following conditions specified in section 6013(e) must be satisfied: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General.--Under regulations prescribed by the Secretary, if (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reasons to know, that there was such substantial *492 understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. The preliminary prerequisite for relief under section 6013(e)(1)(A) is that petitioners filed joint tax returns for each year in issue. This requirement has been satisfied. The second requirement is that there be a substantial understatement of tax attributable to grossly erroneous items of one spouse. "Grossly erroneous items" in section 6013(e)(1)(B) include any item of gross income attributable to such spouse which is omitted from gross income. Sec. 6013(e)(2)(A). "Substantial understatement" in sections 6013(e)(1)(B), (C), and (D) means any understatement of tax (as defined in section 6661(b)(2)(A)) which exceeds $500. Sec. 6013(e)(3). As discussed *493 above, petitioners omitted from gross income amounts resulting in understatements of tax in excess of $500 for each taxable year in issue. Therefore, Clifton has satisfied the second requirement for relief under section 6013(e)(1)(B). Section 6013(e)(1)(C) requires Clifton to establish that he did not know or have reason to know of the understatement of tax when he signed the return. In order to satisfy this burden, Clifton must establish (1) that he did not have actual knowledge of the understatement of tax, and (2) that the omission was not of such character to cause a reasonably prudent person possessed of petitioner's experience to have known of the omission. These matters are questions of fact. Purcell v. Commissioner, 86 T.C.     (Feb. 26, 1986); Terzian v. Commissioner,72 T.C. 1164, 1170 (1979). We are of the view Clifton reasonably should have known that the improvements to the real property at issue constituted dividend income. The corporate expenditures in issue are extreme. Two of the three parcels of land are located in relative proximity to Clifton's *494 residence and office. Clifton possesses expertise concerning construction estimates and sales bids such that a mere viewing of the extensive construction at Highland and Brown Bridge should have aroused his conscience to warrant a determination as to whether the interests of Clevenger Corporation were properly trated. As to the improvements at Tucker Lane, Clifton reasonably should have been aware or at least inquisitive as to whether petitioners in fact reimbursed Clevenger Corporation concerning the improvements. We have determined that extreme marital stress and an unusual business relationship with his estranged wife negate a finding of fraudulent intent. However, we are convinced that Clifton's ostrich imitation was not reasonable and that he certainly should have been aware that these extensive improvements to real property constituted dividend income. Clifton has also failed to establish the section 6013(e)(1)(D) requirement. We see no inequity to hold Clifton liable for the deficiencies determined. The constructive dividends improved real property which Clifton jointly owned with Catherine. Pursuant to the property settlement Clifton received all Catherine's interest *495 in Clevenger Corporation and related entities. Clifton also received Tucker Lane. Consequently, Clifton has not satisfied the section 6013(e)(1)(D) requirement. Indeed, under the circumstances extent, it would be inequitable not to have Clifton share in the deficiency obligations. His aloofness from the financial records may have insulated him from being a part of the fraud, but there is no doubt that he knew, or reasonably should have known, that "Something [was] rotten in the state of Denmark." [12]
Petitioners and respondent submitted, and consequently this Court entered, a stipulated decision of no deficiency concerning petitioners' 1974 joint tax return prior to the issuance of the underlying deficiency herein. It is significant, however, that the stipulated decision did not involve constructive dividends or section 6653(b) additions. Clifton asserts that assessment and collection for the 1974 taxable year is barred by res judicata. We disagree and determine that respondent is entitled to issue a second notice of deficiency determining an additional deficiency in tax and addition to tax for fraud even though the prior *496 stipulated decision of this Court is final. Breman v. Commissioner,66 T.C. 61, 70 (1976). Clifton also asserts that assessment and collection of the deficiencies and additions to tax for the years 1973, 1974, and 1975 are barred by the statute of limitations set forth in section 6501(a).[13] Catherine has conceded that fraudulent returns were filed for each of the years in issue. Consequently, assessment and collection as to these years is not barred. Sec. 6501(c); Vannaman v. Commissioner,54 T.C. 1011 (1970). Based on the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The cases designated docket Nos. 5586-80, 23106-80 and 3753-81 are those of petitioner Clifton Clevenger, and the case designated docket No. 10545-80 is that of Catherine Clevenger. These cases have been consolidated for trial, briefing and opinion.↩
2. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. By stipulation, but subject to a determination by the Court that petitioners received constructive dividends from Clevenger Corporation and C & C Builders, Inc. during any year in issue and subject to a determination that the payment of $50,000 by Catherine Clevenger to Clevenger Corporation during 1980 did not operate to reduce the dividends asserted by respondent to have been received during the years 1973 and 1974, Clifton agrees that the amount, the source and the character of the asserted constructive dividends shall be as follows: Clevenger Corporation
Long term Capital Gain
Ordinary
before I.R.C. § 1202
Income
50% deduction
Nontaxable
1973
$48,358
1974
42,653
$12,524 * $6,667
1975
19,224
37,686
1976
96,018
1977
38,133
77,560 ** 25,000
1978
32,513 ** 25,000
C & C Builders, Inc.
Ordinary Income
1973
$4,074
1974
4,510
1975
5,176
1976
8,856
1977
1978
* Return of Capital ** Amount repaid to Clevenger Corporation by loan cancellation. ↩
4. Catherine concedes that each individual return in issue was filed on a fraudulent basis. Furthermore, Catherine concedes that for each year the Court determines Clifton to be jointly liable for income tax, she agrees by stipulated settlement pertaining to this proceeding as well as her petition in docket no. 3889-81 to be liable for such deficiency so determined herein as well as the corresponding section 6653(b) addition, but not to exceed the amounts as follows: Deficiency
Addition
1973
$36,785 $15,893
1974
34,842 17,421
1975
27,528 13,764
1976
38,154 19,077
1977
51,890 2,595
1978 * 47,060 2,500 ** (34,686)
* Deficiency before net operating loss from 1981 ** Overpayment after net operating loss from 1981↩
5. Clevenger Supply Company is a corporation formed in the year 1968 and engages in equipment leasing activities. However, such activities are not relevant to the determinations herein.↩
6. There is agreement that the latter two notes should each have been executed in the amount of $22,500. [Stip. 13]↩
7. Petitioners have filed separate but interdependent stipulations as to the source, the amount, and the character of the constructive dividend income at issue. See notes 3 and 4, supra.↩
8. Helgesen Properties, Inc. v. Commmissioner,T.C. Memo. 1983-771↩.
9. Respondent has agreed to allocate the offset of January 1980 to reduce constructive dividends received in 1977 and 1978. See note 3, supra.↩ We express no opinion as to the treatment of respondent's January 1980 offset.
10. Hudgens v. Commissioner,T.C. Memo. 1985-587↩.
11. Sec. 6013(e)↩ as amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801, with retroactive application to all taxable years to which the Internal Revenue Codes of 1954 and of 1939 apply. See H. Rept. 98-432, (Pt. 2) 1501, 1503 (1984).
12. Shakespeare, Hamlet,↩ Act I, Scene 4.
13. We note that the 1974 and 1975 taxable years also remain open under section 6501(e)(1)(A).↩