FRANK J. SCARAFILE AND MARY A. SCARAFILE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scarafile v. Commissioner
Docket No. 15835-88
United States Tax Court
T.C. Memo 1991-512; 1991 Tax Ct. Memo LEXIS 561; 62 T.C.M. (CCH) 983; T.C.M. (RIA) 91512; October 9, 1991, Filed *561 Decision will be entered under Rule 155. Frank J. Scarafile, pro se. Patrick W. Turner, Susan T. Becker, and William F. Halley, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION The issues in this case generally relate to respondent's determination that petitioner Frank J. Scarafile received bribe and kickback income in 1978 and 1979. Respondent determined the following deficiencies and additions to tax: Deficiency
Additions to tax
(Frank J. Scarafile
(Frank J. Scarafile only)
Year
and Mary A. Scarafile)
Sec. 6653(b)
1978
$ 82,096
$ 41,048
1979
22,404
11,202
The issues for decision are: (1) What amount of unreported bribe and kickback income, if any, petitioner received in 1978 and 1979. We hold that petitioner received unreported income of $ 104,500 in 1978 and $ 41,500 for 1979. (2) Whether petitioner Frank J. Scarafile is liable for the addition to tax for fraud under section 6653(b) for 1978 and 1979. We hold that he is. (3) Whether petitioner Mary A. Scarafile is entitled to treatment as an innocent spouse under section 6013(e). We hold that she is not. References to petitioner in the singular are to *562 Frank J. Scarafile. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Petitioners Frank J. Scarafile and Mary A. Scarafile resided in Union City, New Jersey (Union City), when the petition was filed in this case. Petitioner is a high school graduate. He was employed as a policeman by Union City from 1952 until his retirement in 1980. He was consistently promoted in the police department, holding the ranks of sergeant, lieutenant, and captain. He spent most of his career in the detective bureau. Petitioner was elected to the Union City Board of Education in 1974. He was Deputy Chief of Police and was a member of the Union City Board of Education beginning in 1974, through 1978 and 1979, and until the criminal case relating to the bribe and kickback income at issue here. Petitioner Mary A. Scarafile was employed as a secretary with the Union City Department of Public Safety during 1978 and 1979. Her salary was $ 10,150 in 1978 and $ 10,650 *563 in 1979. She had a prior marriage which ended in divorce on March 17, 1977. Petitioners were married on September 17, 1977. Petitioners maintained joint bank accounts from which they paid their mortgage and household expenses. During 1978 and 1979 petitioners jointly owned their residence in Union City. The home also has two rental units. On June 24, 1982, after petitioner's conviction (described below), petitioner transferred his interest in the residence to Mary A. Scarafile. Petitioners also owned a house on the New Jersey shore at Seaside Park in 1978 and 1979. They went there every weekend during the summers. It was purchased before the years at issue. During 1978 and 1979, petitioners supported four children and petitioner's former mother-in-law. At that time they had a combined annual salary of about $ 46,500. When she was separated, Mrs. Scarafile's former husband sometimes paid for his children's schooling. Petitioners went to Atlantic City twice a month during the summers to gamble. They also gambled several times at Las Vegas and occasionally at the Meadowlands Racetrack during the years at issue. They also frequently attended social functions in Union City *564 which required donations and contributions during the years at issue; however, their tickets were often given to them by others. Mrs. Scarafile voluntarily signed petitioners' income tax returns for 1978 and 1979, but was not involved in preparing them. 2. Petitioner's Conviction
Petitioner was indicted by a Federal grand jury in New Jersey on June 29, 1981. He was charged with two counts of violating the Racketeer Influenced and Corrupt Organizations Act, three counts of attempted extortion and extortion, one court on interstate travel in aid of racketeering, 21 counts of mail fraud, five counts of wire fraud, and two counts of willfully subscribing to a false Federal income tax return for the years 1978 and 1979 in violation of section 7206(1). The indictment charged the following violation of section 7206(1): COUNT 39
That on or about April 5, 1979, in the District of New Jersey, the defendant FRANK J. SCARAFILE a resident of Montclair [Union City], New Jersey, did knowingly and wilfully make and subscribe, and cause to be made and subscribed, a Joint Income Tax Return (Form 1040) for himself and his wife for the calendar year 1978, which was verified by *565 a written declaration that it was made under the penalties of perjury and which was filed with the Internal Revenue Service, which said income tax return he did not believe to be true and correct as to every material matter, in that it was stated on Line 21, Page 1, of the said income tax return that the total income was $ 46,563.00, whereas, as the defendant then and there well knew and believed, the total income amount for the period reported was substantially greater than the amount heretofore stated. In violation of Title 26, United States Code, Section 7206(1). COUNT 40
That on or about April 16, 1980, in the District of New Jersey, the defendant FRANK J. SCARAFILE a resident of Union City, New Jersey, did knowingly and wilfully make and subscribe, and cause to be made and subscribed, a Joint Income Tax Return (Form 1040) for himself and his wife for the calendar year 1979, which was verified by a written declaration that it was made under the penalties of perjury and which was filed with the Internal Revenue Service, which said income tax return he did not believe to be true and correct as to every material matter, in that it was stated on Line 22, Page 1, of the *566 said income tax return that the total income was $ 41,879.00, whereas, as the defendant then and there well knew and believed, the total income amount for the period reported was substantially greater than the amount heretofore stated. In violation of Title 26, United States Code, Section 7206(1).
Rudolph Orlandini (identified below) testified against the defendants in the criminal trial, as part of a plea agreement in which he pleaded guilty to conspiring to, (1) Pay bribes and kickbacks to State and local officials in violation of Federal and State law, and (2) defraud the United States in violation of 18 U.S.C. section 371. All other charges against Orlandini were dropped and his testimony was not to be used against him in any subsequent criminal proceedings. Orlandini was placed in the United States Marshals Service's Witness Protection Program. Orlandini's testimony in the criminal trial occurred before his sentencing. At petitioner's criminal trial, Judge Sarokin charged the jury that as a matter of law, an omission of income derived from bribery, extortion, and fraud is a material matter for purposes of the third element charged. To convict petitioner of violating *567 section 7206(1), the jury was required to find that he omitted a substantial amount of income from his 1978 and 1979 income tax returns. At petitioner's criminal trial, the judge included the following charge to the jury: You will note that the indictment does not state the amount of total income that was allegedly not included on the defendants' tax returns, but rather it states that the defendants' total income was substantially greater than the amount they reported. With regard to the allegations of "substantial" -- you are instructed that substantial is not measured in terms of gross or net income, nor any particular percentage of tax shown to be due and payable. All of the facts and circumstances of the case would be considered. A few thousand dollars of unreported receipts may, in a given case, warrant such a finding. The government need not prove exact dollar amounts. Thus, it is not necessary for the government to prove the exact amount of income alleged to have been omitted. It is enough that the government prove beyond a reasonable doubt that some substantial amount of income was received and not reported. Likewise, it is not necessary for the government to establish *568 that there was a specific or even any amount of tax evaded. The proofs need not be precise in an accounting sense. There must be proof sufficient to establish beyond a reasonable doubt that there has been a failure to include total income of a substantial amount of which the accused was aware. I charge you that as a matter of law that an omission of income derived from bribery, extortion and fraud is a material matter within the meaning of Title 26, United States Code, Section 7206(1).
Petitioner was convicted on May 10, 1982, of all charges, including willfully subscribing to false Federal income tax returns for 1978 and 1979. William V. Musto (Musto) and John J. Powers (Powers) were convicted with petitioner. During 1978 and 1979, Musto was an elected member of the Board of Commissioners of Union City, mayor of Union City, and a NewJersey State senator. Powers was president of the Union City Board of Education. Petitioner first met Musto in the early 1950s. They have been close friends since the early 1970s. Petitioner first met Powers in 1973 or 1974. 3. The Bribery Scheme
a. Background
Rudolph Orlandini (Orlandini) and Thomas Principe (Principe) formed *569 Orlando Construction Company (Orlando Construction) in 1974. It was originally formed to develop a senior citizens' building, later known as Bella Vista, and some strip stores in Union City. Anthony Genovese (Genovese) was the architect for all the public projects handled by Orlando Construction. Genovese was a partner in an architectural firm, Genovese and Maddalene, A.I.A., which was hired by the Union City Board of Education as architects of record on the Union Hill and Emerson High Schools projects. Genovese was convicted with petitioner on May 10, 1982. Petitioner first met Genovese in 1974 or 1975. Genovese introduced Orlandini to Powers. Powers introduced Orlandini to petitioner and Musto. In July 1980, Orlandini agreed to cooperate with the Government and to monitor a number of conversations with several of the defendants in United States v. Musto, 540 F. Supp. 346 (D.N.J. 1982), affd. sub nom. United States v. Aimone, 715 F.2d 822 (3d Cir. 1983). Orlandini testified for 26 days on behalf of the Government at the criminal trial. The parties stipulated that excerpts of Orlandini's testimony at the criminal trial would be his *570 testimony in this case, but not that it was true. Orlandini paid bribes and illegal kickbacks to various public officials in Union City including petitioner. During 1978 and 1979, Orlandini maintained a payoff sheet for bribes and illegal kickbacks paid to various individuals. Dominick D'Agostino, Orlandini's partner, also paid illegal bribes and kickbacks to petitioner. b. Bella Vista
Bella Vista Apartments (Bella Vista) is a 24-story, 231-unit senior citizens' housing project located in Union City. It was built by Orlando Construction and Anastasia Brothers Construction, and was financed by the New Jersey Housing Finance Agency (NJHFA). Financing from the NJHFA for the Bella Vista Housing Project resulted in a $ 7,560,000 mortgage for the project. Bella Vista was built under a rent subsidy program, in which the Federal Government subsidized 75 percent of the rent needed to operate the building. Before NJHFA financing and Federal rent subsidies could be made available, a bond had to be obtained for the project, and a tax abatement issued by Union City. Union City awarded a tax abatement to Bella Vista. Bella Vista could not have been built without the tax abatement. *571 The tax abatement saved Bella Vista $ 125,000 in taxes each year for forty years. Orlandini paid petitioner $ 38,000 in 1978 for his help in obtaining the Bella Vista tax abatement. This amount was part of $ 50,000 petitioner was to receive for the tax abatement. Respondent determined $ 12,667 of this amount was petitioner's income. Orlandini told the FBI that he paid petitioner $ 9,000 for Bella Vista. c. The Schools
On February 16, 1977, Orlando Construction submitted a bid proposal for renovations and additions to Union Hill High School in Union City. On September 27, 1977, Orlando Construction submitted a bid proposal for renovations and additions to Emerson High School in Union City. Petitioner approached Orlandini when Orlando Construction submitted its bid on Union Hill and asked "what's in it for [us]." Orlandini and petitioner agreed that Orlandini would pay a $ 40,000 bribe to petitioner and that Orlando Construction would receive the contracts for both Union Hill and Emerson High Schools. The Union City Board of Education and Orlando Construction executed a contract on October 24, 1977, for alterations and additions to Union Hill High School, and on December *572 1, 1977, for alterations and additions to Emerson High School. Although performance bonds ensuring completion of the projects were required to be filed, Orlando Construction did not do so. Construction began on both projects without the bonds. Orlando Construction submitted fraudulent certificates and inflated applications for payment. Armand T. Christopher, now deceased, was employed as Clerk of the Works for the Architectural firm of Genovese and Maddalene and was responsible for ensuring that the architect's plans and specifications were followed by Orlando Construction. Mr. Christopher noticed irregularities with respect to the filing of performance bonds. His diligence as Clerk of the Works led to the curtailment of his duties on the school projects. Upon Mr. Christopher's curtailment, Genovese assumed sole responsibility for reviewing the certificates and applications for payment. On February 28, 1978, Genovese agreed to use fraudulent change orders relating to excavations and foundation work to divert funds from the school projects. The fraud involved four change orders signed by Genovese on August 10 and October 2, 1978, requiring mass excavations not required by *573 the contract at Union Hill and Emerson. The excavation called for by the change orders was never done, and could not have been undertaken without impairing the structural integrity of adjacent buildings and the footings and walls which had been completed at the two projects before August 1978. Respondent determined petitioner received $ 40,000 in this regard. Orlandini requested an advance payment of $ 190,000 for the fraudulent change orders by letter dated April 25, 1978, to Genovese and Maddalene. Gildo Aimone (Aimone), Executive Director of the Union City Housing Authority, gave Orlandini advances by checks totaling $ 190,000 for the fraudulent change orders on April 27 and 28, 1978. The checks were cashed and Orlandini received the cash to pay bribes and kickbacks to petitioner. Orlando Construction received $ 261,057 for change order 10 on Union Hill, $ 195,913 for change order 2 on Emerson and $ 39,583 for change order 3 for Emerson. Change order 11 for $ 35,337 for Union Hill was paid on October 27, 1978, and paid a second time on November 14, 1978. In February 1978, Musto, Powers, and petitioner agreed that Aimone should fund $ 153,000 for Orlando Construction to *574 purchase the long-overdue performance bonds for the school projects and to pay kickbacks. Under this agreement, Orlandini prepared and submitted a forged request for payment for $ 153,000 to Aimone, ostensibly for work already performed on the projects. Petitioner received $ 40,000 of kickback income in connection with the fraudulent change orders for the schools in 1978. Respondent determined petitioner received $ 40,000 in this regard. d. Vista View
Orlando Construction built Vista View, an office and medical building in Union City, adjacent to Bella Vista. As of March 1979, Orlando Construction's cash position was very poor and the schools were only 50 to 60 percent complete, but little or no money was left to be paid by the Board on the contracts. In order to raise money, Orlandini discussed with Musto, Powers, and petitioner plans to have Union City purchase the Vista View building in return for a bribe. Petitioner received $ 25,000 with respect to the proposed purchase of the Vista View. On January 15, 1980, a public referendum defeated the proposed Vista View purchase. e. Tyler Park Towers
Orlando Construction planned to build a senior citizens' project *575 similar to Bella Vista in North Bergen, New Jersey, to be called Tyler Park Towers. Tyler Park Towers was never built, but the city of North Bergen authorized a tax abatement. Orlandini paid bribes to petitioner in connection with the Tyler Park Towers project. Orlandini gave $ 55,000 in cash to petitioner to give to the NJHFA's executive director as a partial down payment on Tyler Park and other projects with NJHFA. Orlandini made two separate payments to petitioner. The first was in August 1978 for $ 25,000 for the NJHFA's executive director. Orlandini and petitioner drove in petitioner's car to the NJHFA. Orlandini gave petitioner $ 25,000 in a paper bag. Petitioner entered the building with the bag while Orlandini waited in the car. Petitioner still with the bag emerged from the building with the director and they drove off in another vehicle. They returned a short time later whereupon petitioner told Orlandini he gave the director the money. The second payment not too long after the first was for $ 30,000. Orlandini again gave the money to petitioner to give to the executive director. We are not convinced that petitioner gave any of the $ 30,000 to anyone else. Orlandini's *576 payoff sheet lists the single amount of $ 55,000 in cash with "-- F.S." written to the right of the NJHFA director's initials. Respondent attributes all $ 55,000 to petitioner. In 1978 or 1979 Orlandini paid petitioner $ 12,000 in cash to smooth things over in North Bergen with the mayor and others with respect to Tyler Park. Petitioner gave some of this money to others. f. Snow Removal
In February 1978, Orlando Construction submitted a $ 17,490 and a $ 10,920 bill for snow removal to Union City. On April 20, 1978, Union City issued a $ 28,410 check to Orlando Construction. The snow removal bills were inflated with respect to both the rental charge for machinery and the number of hours spent removing snow. Orlandini and petitioner agreed to share the surplus proceeds. Petitioner's share was to take care of Musto and others. Orlandini made cash payments of $ 5,000, $ 2,000 and $ 2,000 to petitioner as snow removal kickbacks for a total of $ 9,000 in 1978. Respondent determined $ 4,500 of this amount is petitioner's income. h. Personal Payments
Orlandini gave petitioner $ 5,000, $ 4,000, and $ 5,000 for petitioner's personal use in 1978 and $ 4,000 for petitioner's *577 personal use in 1979. This amount was not reported on petitioner's income tax returns for those years. Orlandini paid petitioner $ 37,500 in 1979. These payments were not identified with any particular project on Orlandini's payoff sheet. Orlandini provided petitioner with gambling money. OPINION 1. Amount of Unreported Bribe and Kickback Income Received by Petitioner
Respondent determined that petitioner received but failed to report bribes and kickbacks of $ 138,167 in 1978 and $ 46,500 in 1979. Petitioners point to numerous discrepancies in Orlandini's testimony suggesting that respondent's determination is arbitrary because it is based solely on Orlandini's self-serving testimony. Respondent's determination and evidence is based in large part on Orlandini's testimony at the criminal trial in which petitioner and others were convicted. We conclude that the determination was not arbitrary. Consequently, the notice of deficiency is presumed to be correct. Petitioners bear the burden of proving their tax liability as determined in the notice of deficiency is in error. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Petitioner argues *578 that there are numerous inconsistencies in Orlandini's testimony. At the criminal trial, Orlandini admitted that he could have been lying when he may have told someone else that he had given petitioner $ 80,000 for snow removal when he actually gave him $ 9,000. Orlandini testified that he did not know how accurate his numbers were. Orlandini also admitted to other illegal behavior such as conspiring to cash ghost employee checks. Respondent relies heavily on Orlandini's payoff sheet. However, we find defects in Orlandini's payoff sheet as a basis for deciding the amount of bribes paid to petitioners. No dates or places are recorded on the sheet. The 1979 payments to petitioner do not appear to be for any particular project. The sheet had unexplained erasures. Orlandini made some entries before payment. Orlandini testified that it would be difficult for him to say whether there was any articulable rhyme or reason for entries on the payoff sheet. Orlandini also testified that he was not sure how accurate his entries were. Orlandini testified that he did not know what some of the labels meant that he placed on the payoff sheet. The judge at the criminal trial said: THE *579 COURT: Gentlemen, I had the opportunity last night to review my notes, although I did not have the transcript. The voir dire of Mr. Orlandini respecting Exhibit 119 [the payoff sheet], reveals that according to his testimony, he made entries of amounts paid and to whom those payments were made. No dates are included in 119. He testified that the entries were made immediately after payment, but in no event later than two weeks after the individual payments were made. He further testified that the purpose of the list was basically for his own protection so that he could report, if necessary, to Mr. Principe, Mr. Dentico and Mr. D'Agostino. He said that he wanted to be able to account for the monies of Orlando Construction Company which were not expended as an ordinary part of the construction business. All entries were made in his own handwriting. He testified that all entries were made before any cooperation by him began with the Government. As I recall, two of the entries were made in ink, but the balance were all made in pencil. And based upon the Court's observation of the document and Mr. Orlandini's testimony, it is clear to the Court that the entries were made at different *580 times. No one could look at this document and argue that all of the entries were made, for instance, on a single day. In addition to that, Mr. Orlandini testified that he did display the document to Mr. Dentico and Mr. D'Agostino, to Mr. Dentico -- as I recall, a number of times, which is not important for the purpose of this discussion, at least once and possibly twice to Mr. D'Agostino. On cross-examination, without attributing a particular fact to any particular counsel, it was revealed that the document includes totals which the witness is unable to explain or relate to any other information on the form. He never showed the document to his secretary, although he described his relationship with her as very close, she was his girlfriend, and apparently she participated in some of the illegal activities, such as the cashing of checks for the ghost employees. He only showed the document once to Lawrence Dentico and never showed it to Thomas Principe. It might be argued that that is inconsistent with his avowed purpose of the document in that he created it primarily so that he could display that information to them. Despite the obvious character of the document as he described *581 it, he apparently left it in an unlocked desk, and he testified that it was available to a number of people. There were erasures which are unexplained. He does include in the document payments that were never made, and he does include in the document entries of payments before they were made, although he testified that some of them were subsequently made. In addition to that, he identified at least one check as a cash payment. There also is, as Mr. Ford mentioned, some coincidence that the lines separating the column of figures is coexistent with the figures themselves, lending some credence to the fact that maybe all of the entries were made at one time when the line was drawn, otherwise that is an amazing coincidence. He also testified that all payments were not included. Although he contends that the document represents all illegal payments, it appears at least one payment, namely a payment on account of land acquisition, appears to be, at least in the view of the Court, a legitimate rather than an illegitimate payment.
We are faced with the difficult task of examining a series of criminal enterprises that we believe occurred generally as described by Orlandini, but for *582 which we must decide an exact amount of unreported income for petitioner. Most of the payments that Orlandini made to petitioner were made outside the presence of anyone else. However, we find that petitioner was involved and we are not persuaded by petitioner's blanket denial of receipt of bribes and kickbacks. We note that petitioner has provided no corroboration for his version of the facts. Respondent determined the following amounts were paid by Orlandini to petitioner: 1978
Petitioner's
Share as Determined
Transaction
Total Bribe
by Respondent
Bella Vista
$ 38,000
$ 12,667
Snow
9,000
4,500
Schools (dirt)
120,000
40,000
Personal
9,000
9,000
Tyler Park
55,000
55,000
Hoboken
5,000
5,000
Tyler Park
12,000
12,000
Total to Petitioner
138,167
1979
Petitoner's
Transaction
Total Bribe
Share
Personal
$ 9,000
$ 9,000
Continuation
75,000
37,500
of all
Total to Petitioner
46,500
Petitioner contends that he did not receive any money, and if he did, the money he received was not income because he was a mere conduit from Orlandini to others. We shall discuss each of the payments determined by respondent to be income for *583 petitioner. a. Bella Vista Apartments
The parties stipulated that excerpts of Orlandini's testimony in the criminal trial would also be his testimony in this trial, but they did not stipulate to its truth. Orlandini testified that he paid petitioner a $ 38,000 bribe in 1978. Orlandini kept a record of his bribes on a payoff sheet which shows $ 38,000 paid to "F.S." referring to petitioner. Of this amount, respondent determined that $ 12,667 is income to petitioner. Petitioner claims not to have received any of that money. Petitioner also charges that Orlandini fabricated the book to account for the money he gave to his silent partners who were members of organized crime. He offered no evidence to corroborate this, and we do not believe it. Petitioner correctly points to a discrepancy in Orlandini's testimony wherein Orlandini told the FBI that he paid $ 9,000 to petitioner for Bella Vista. Because of Orlandini's inconsistent statement, we conclude that petitioner is to be charged with $ 9,000 as his share of the unreported bribe income with respect to Bella Vista. b. Snow Removal
Orlando Construction performed snow removal operations for Union City during the *584 winter of 1978 and submitted inflated bills for the work. Orlandini paid petitioner $ 9,000 in cash kickbacks during 1978 for the inflated snow removal charges. The snow removal amount was not a part of the indictment; petitioner argues thus that it should not be a part of this case. We disagree. Orlandini's testimony provides reasonable grounds for respondent's determination and our finding that petitioner received income relating to the snow removal. Respondent determined that $ 4,500 of this amount is chargeable to petitioner as income. Respondent's worksheet charges the other $ 4,500 that Orlandini gave to petitioner as being given to Musto. This is partly shown by Orlandini's testimony that the $ 9,000 was for "Scarafile, Mr. Musto, whoever else they had to take care of." Petitioner argues that he did not receive any of this money. However, petitioner provided no corroboration for his position. We find that petitioner received $ 4,500 of unreported income from snow removal kickbacks. c. Schools (Dirt Change Orders)
Orlando Construction was the general contractor for the Union City Board of Education's renovations and additions at Union School and Emerson School *585 beginning in late 1977 and continuing through the years at issue. Orlandini and Genovese used fraudulent change orders relating to excavations and foundation work, consisting primarily of dirt and sand, to divert funds from the projects. Orlando Construction also submitted requests for payment on work never performed or for which it had previously been paid. Respondent contends that a total $ 120,000 was paid to petitioner, Powers, and Musto, in 1978. This is based in large part on Orlandini's payoff sheet which showed under the word "dirt" a list of figures. The figures were 40, 20, 20, 80, 30, and 10. Orlandini testified that the 80 amount did not represent what petitioner got, but rather what he was supposed to get. Orlandini said that the amounts represented thousands, thus the total was $ 120,000. The payoff sheet is troubling because Orlandini testified that the first three figures, 40, 20, and 20, were not a record of payment, but rather were a record of what Orlandini had decided the kickback recipients were going to get. Orlandini also admitted that the initials "F.R." that he used to refer to petitioner could have been written as much as a year after he entered *586 the figures. Of this amount petitioner is charged by respondent with $ 40,000 in income. According to Orlandini's testimony and respondent's worksheet, the $ 120,000 was to be divided equally between petitioner, Powers, and Musto. Petitioner contends that he did not receive any funds. He offered no corroboration for his position. Consequently, we find that petitioner received but did not report income of $ 40,000 from dirt change orders on the school projects. d. Personal
Respondent argues that petitioner received but did not report $ 9,000 of income as a "consultant" to Orlando Construction in both 1978 and 1979. The payoff sheet indicates a $ 5,000 and a $ 4,000 amount under "Frank" that Orlandini testified was paid to petitioner for his personal use in 1978, but he was unsure of the date. The payoff sheet indicates another $ 5,000 and $ 4,000 amount under "Frank S." that Orlandini testified was paid to petitioner for his personal use in 1978 or 1979. Petitioner argues that these $ 9,000 amounts did not appear in the indictment, and thus may not be a part of respondent's determination. As previously discussed, we disagree. As to the second $ 9,000, we attribute the *587 $ 5,000 payment to 1978 and the $ 4,000 to 1979. Petitioner argues that he did not receive any of this money. We do not believe petitioner in this regard. Respondent also argues that "petitioner was also paid an additional $ 37,500 during the tax year 1979 for his influence as the Deputy Chief of Police of Union City, and as a member of the Board of Education, which amount was unrelated to any of the other bribes and kickbacks on specific projects as set forth above." We note that respondent labeled the $ 37,500 amount for 1979 as continuation rather than personal amounts in a chart in respondent's opening brief. Orlandini's payoff sheet has a heading of "75" under which are two columns each with the heading "37-5." The left column has the letter "F" and the right column "J." The column under the "F" has the following entries, 12,000, 7,000, 1,000, 1 [1,000] 500, 500, 500, 5,000, 2,000, 4,000, 10,000, 5,000, and 2,000, which total $ 49,500. Orlandini testified that these entries reflect an arrangement with petitioner and Powers whereby they would each get $ 37,500. Orlandini said that he paid to petitioner the amounts indicated on his sheet. Orlandini testified that the amounts *588 were actually given to petitioner in 1979. Petitioner denies receiving any of this money and further alleges that neither the $ 49,500 nor the $ 37,500 amounts were included in the indictment. We disbelieve petitioner's denial that he received any of this money. For reasons set forth above, we disagree with petitioner's argument that the income may not be included in the notice of deficiency since it was not a part of the criminal indictment. Accordingly, we conclude that the $ 37,500 amount is attributable to petitioner as unreported income in 1979. Based partly on respondent's omission of Vista View on brief in the chart setting forth each transaction and amount of income attributable to petitioner and on the record as a whole, we conclude that the $ 37,500 amount includes any income petitioner received with respect to Vista View. e. Tyler Park
Before 1978, Orlando Construction had planned a senior citizens' project similar to Bella Vista, which was to be called Tyler Park Towers. Although never built, it received a tax abatement in June 1977 from North Bergen, New Jersey. Orlandini testified that he gave petitioner $ 12,000 ($ 5,000, $ 5,000, and $ 2,000) in 1979 *589 to get to the mayor and whoever he had to take care of in North Bergen as a bribe for the tax abatement. On Orlandini's payoff sheet there is a heading with the NJHFA executive director's first name and last initial (with F.S. off to the right) and an entry of $ 55,000. Orlandini testified that the entry represents money he gave to petitioner to give to the NJHFA executive director in the fall of 1978. Orlandini further testified that the money was a partial downpayment on Tyler Park and other projects to be developed through NJHFA. Based on the fact that we are not convinced by petitioner's testimony that he was not given any of this money, and the testimony of Orlandini, we find that petitioner received but failed to report the second payment of $ 30,000. Similarly, with respect to Tyler Park we attribute $ 7,000 of the $ 12,000 to petitioner as unreported income. f. Hoboken
Respondent contends that the $ 5,000 amount for 1978 set forth in the notice of deficiency is for "Hoboken." Respondent points to Orlandini's payoff list that shows a $ 3,000 and a $ 2,000 payment under the heading "F.S., Hoboken." and Orlandini's testimony at the criminal trial that "They represent *590 moneys that I had given to Frank Scarafile that was supposed to get down to Mayor of Hoboken, Steve Cappiello." Orlandini further testified that he made the payments in 1979 during a convention in Atlantic City. Petitioner argues that at the criminal trial the Government conceded that certain amounts now determined to be his bribe or kickback income were legitimate payments. Petitioner points to comments in excerpts in the transcript by Assistant United States Attorney Plaisted at the criminal trial. We cannot tell if Mr. Plaisted's comments refer to the $ 5,000 which is at issue here. Moreover, petitioner denies ever receiving any money related to Hoboken. Petitioner does not contend or offer any evidence supporting a theory that he received the $ 5,000 but gave it to the mayor. We conclude that petitioner received the $ 5,000 with respect to Hoboken and that it is his unreported income. Petitioner relies on a conduit theory to reduce any payments he received. We have taken into account amounts we found he paid to others. We reject any further reliance on the conduit theory. 2. Addition to Tax for Fraud
Respondent determined that petitioner (but not petitioner Mary *591 A. Scarafile) is liable for the addition to tax for fraud under section 6653(b) for 1978 and 1979. Petitioners contend that respondent has failed to clearly and convincingly prove the existence of fraud. The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980); Stratton v. Commissioner, 54 T.C. 255, 284 (1970). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Fraud means "actual, intentional wrongdoing," Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941); Pavlic v. Commissioner, T.C. Memo 1984-182; or the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo 1966-81; McGee v. Commissioner, 61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Over the years, courts have developed a number of *592 objective indicators, or "badges," which tend to establish fraud. Recklitis v. Commissioner, supra at 910. For example, respondent may show various indicia or "badges of fraud" including: (1) Understatement of income, (2) inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, (5) engaging in illegal activities, (6) attempting to conceal illegal activities, and (7) dealing in cash. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986); Lawson v. Commissioner, T.C. Memo 1989-351. Each of these badges of fraud exists in this case. Petitioner understated his income, and offered no records. His position that he did not receive any money is implausible. He definitely attempted to conceal his assets by dealing in cash. He was convicted of illegal activities based on these circumstances including fraud and conspiracy. We conclude that respondent has clearly and convincingly established that petitioner is liable for the addition to tax for fraud under section 6653(b) for 1978 and 1979. 3. Innocent Spouse Status of Petitioner Mary A. Scarafile
Petitioner *593 Mary A. Scarafile argues that she is entitled to relief as an innocent spouse under section 6013(e). Respondent contends that she has failed to carry her burden of proof. We agree with respondent. A husband and wife who file a joint return are jointly and severally liable for tax. Sec. 6013(d)(3). However, section 6013(e) sets out four requirements which, if met, treat a spouse as an innocent spouse, thereby relieving the spouse from joint and several liability. A failure to meet any requirement of section 6013(e) precludes an individual from qualifying as an innocent spouse. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo 1984-310; Estate of Jackson v. Commissioner, 72 T.C. 356, 362 (1979). The taxpayer bears the burden of proving that each element is satisfied. Shea v. Commissioner, supra; Ratana v. Commissioner, 662 F.2d 220, 224 (4th Cir. 1981), affg. in part and revg. in part T.C. Memo 1980-353. *594 We will discuss each requirement separately. a. Joint Return
The taxpayer asserting innocent spouse status must prove that joint returns were filed for each year in issue. Sec. 6013(e)(1)(A). Petitioners filed a joint return for 1978 and 1979 and so this requirement is met. b. Grossly Erroneous Items
The taxpayer asserting innocent spouse status must prove that there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on each return. Sec. 6013(e)(1)(B). A grossly erroneous item includes any item attributable to such spouse which is omitted from gross income. Sec. 6013(e)(2)(A). This requirement is met because this case involves unreported income of the other spouse. c. Knowledge of the Omission
Section 6013(e)(1)(C) requires the spouse to prove that in signing the return she did not know or have reason to know of the substantial understatement. Mrs. Scarafile testified that she had no actual knowledge. Regardless of whether this is true, Mrs. Scarafile has failed to convince us that she had no reason to know of the substantial understatements. The "reason to know" standard is whether a reasonably prudent *595 person having the facts known or reasonably available would have known that the return contained a substantial understatement or that further investigation was warranted. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989); Purcell v. Commissioner, 86 T.C. 228, 238 (1986), affd. 826 F.2d 470 (6th Cir. 1987); Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). We believe that Mrs. Scarafile should have realized that their legal sources of income were insufficient for their lifestyle. Unlike Terzian v. Commissioner, supra, there is no evidence that petitioner totally dominated the family finances. In addition, it appears to us that petitioners shared their income. They had joint bank accounts. Petitioners supported four children and three adults. They maintained their home and a second house at the shore. They did not appear to skimp on their personal entertainment. During the years at issue, petitioners went to Las Vegas several times. Petitioners went to Atlantic City twice a month. They also went to the Meadowlands Racetrack for harness racing. Thus, we conclude that the expenses *596 of their lifestyle gave Mrs. Scarafile reason to know that their reported income was understated. Mrs. Scarafile argues that she had no input in the preparation of the 1978 and 1979 tax returns. She contends that her signature on a return does not prove knowledge of its contents. We need not reach this issue, having found that Mrs. Scarafile had reason to know of the understatement of tax. This Court has recognized certain factors which put a reasonable person on notice. In Norgaard v. Commissioner, T.C. Memo 1989-390, affd. in part and revd. in part on other issues 939 F.2d 874 (9th Cir. 1991), the fact that the taxpayer signed a blank return, did not prepare the return, made no inquiries about the accuracy of the tax return, and did not review it, did not entitle her to claim that she should not have known of the substantial understatement. Similarly, we conclude that Mrs. Scarafile should have known of the substantial understatement of tax on the returns. Although this conclusion alone precludes Mrs. Scarafile from qualifying as an innocent spouse under section 6013(e), we discuss the remaining requirement for completeness. d. Equitable *597 to Hold Jointly Liable for Tax
Finally, the taxpayer asserting innocent spouse status must prove that, taking into account all the facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency. Sec. 6013(e)(1)(D). In deciding whether it is inequitable to hold a spouse liable for a deficiency, we consider whether the purported innocent spouse significantly benefited, either directly or indirectly, from the items omitted from gross income. Sec. 1.6013-5(b), Income Tax Regs.; Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. at 242; H. Rept. 98-432 (Part 2) at 1501, 1502 (1984). We believe Mrs. Scarafile benefited from the unreported income. Petitioners do not convince us that Mrs. Scarafile did not fully share in the use of petitioner's bribe and kickback income, and benefit from the fact that it was omitted from gross income on their Federal income tax returns. We are not persuaded that it would be inequitable to hold her responsible for the deficiency. We find that petitioner Mary A. Scarafile fails the requirements of section 6013(e)(1)(C) and (D). Consequently, *598 we hold that she is not entitled to relief as an innocent spouse under section 6013(e). To reflect concessions and the foregoing, Decision will be entered under Rule 155.